UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NICOLE S. LEWIS,<br><br>          Petitioner,<br><br>     v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security<br>Administration,<br><br>          Respondent. | Case No. 1:17-CV-00522-CWD<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

Currently pending before the Court is Nicole S. Lewis' Petition for Review of the

Respondent's denial of social security benefits filed December 22, 2017. (Dkt. 1.) The

Court has reviewed the Petition and the Answer, the parties' memoranda, and the

administrative record (AR). For the reasons that follow, the Court will remand to the

Commissioner for proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Petitioner filed an application for Disability Insurance Benefits and Supplemental

Security Income on January 27, 2014, alleging disability based on a combination of

**MEMORANDUM DECISION AND ORDER - 1**

impairments including intracranial hypertension, arthritis of the knees, and depression. This application was denied initially and on reconsideration, and a hearing was held on July 7, 2016, before Administrative Law Judge (ALJ) David Willis. After hearing testimony from Petitioner and vocational expert Anne T. Arrington, ALJ Willis issued a decision finding Petitioner not disabled on September 12, 2016. (AR 17-31.) Petitioner timely requested review by the Appeals Council, which denied her request for review on October 24, 2017.

Petitioner appealed this final agency decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the alleged disability onset date of January 26, 2013, Petitioner was twenty-eight years of age. Petitioner has a high school diploma. Her prior employment experience includes work as a newspaper delivery person, sandwich maker, cashier, and fast food worker.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. Here, the ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date of January 26, 2013. At step two, it must be determined whether the claimant suffers from a severe impairment. Here, the ALJ found Petitioner's intracranial hypertension, pseudotumor cerebri, migraines, depression, and obesity severe within the

**MEMORANDUM DECISION AND ORDER - 2**

meaning of the Regulations. (20 C.F.R. pt. 404.1520(c) and 404.1521(b)). The ALJ found Petitioner's bilateral knee pain and low back pain not severe.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's impairments did not meet or equal the criteria for the listed impairments, specifically considering Petitioner's mental impairments under Listing 12.04, and Petitioner's obesity, as required by Social Security Ruling 02-1p.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work. In assessing Petitioner's RFC, the ALJ determines whether Petitioner's complaints about the intensity, persistence, and limiting effects of her symptoms are credible.

Here, the ALJ found Petitioner's complaints were not entirely credible, based on certain inconsistencies in Petitioner's testimony compared to the objective medical evidence of record, and Petitioner's prior statements. Upon consideration of the medical opinion evidence, the ALJ gave significant weight to the assessment of state-agency medical consultants, Barry Cusack, M.D., and Robert Vestal, M.D., and limited weight to the headache medical source statement completed by Petitioner's treating physician, James Whiteside, M.D. Also, at step four, the ALJ found Petitioner was not able to perform her past relevant work as a newspaper delivery person, sandwich maker, cashier, or fast food worker.

**MEMORANDUM DECISION AND ORDER - 3**

If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate, at step five, that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education and work experience. At step five, the ALJ found Petitioner could perform sedentary jobs that exist in significant numbers in the national economy, including that of a document scanner, accounts clerk, or manual food processor. Consequently, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is to uphold the Commissioner's decision if it is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g);

**MEMORANDUM DECISION AND ORDER - 4**

*Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

On review, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role

as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner asserts the ALJ erred at step four. Specifically, Petitioner argues the ALJ erred by: rejecting the opinion of a treating physician without providing clear and convincing reasons for doing so; failing to provide clear and convincing reasons for his finding that Petitioner's testimony was not credible; rejecting the testimony of a lay witness, Petitioner's husband, without providing a germane reason; and finally, by determining an RFC not supported by substantial evidence. Each challenge to the ALJ's determination will be discussed below.

**1.      Physician Opinions**

Petitioner alleges that the ALJ committed reversible error when he rejected or assigned little weight to the opinion of a treating physician without providing clear and convincing reasons. (Dkt. 13 at 8.)

Case law from the United States Court of Appeals for the Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). *Lester v. Chatter*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is accorded to the opinion of a treating source than to non-treating physicians. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). If the treating

**MEMORANDUM DECISION AND ORDER - 6**

physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). If the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983). In turn, an examining physician's opinion is entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).

An ALJ is not required to accept an opinion of a treating physician if it is conclusory and not supported by clinical findings. *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a physician's opinion of a petitioner's physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support the physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities. *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999). However, an ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self -reports that have been property discounted as not credible.

**MEMORANDUM DECISION AND ORDER - 7**

*Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Reports of treating physicians submitted relative to a claimant's work-related ability are persuasive evidence of a disability due to pain and her inability to engage in any form of gainful activity. *Gallant v. Heckler*, 753 F.3d 1450, 1454 (9th Cir. 1984). Although the ALJ is not bound by expert medical opinion on the issue of disability, he must give clear and convincing reasons supported by substantial evidence for rejecting such an opinion where it is uncontradicted. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Gallant*, 753 F.2d at 1454 (citing *Montijo v. Secretary of Health & Human Services*, 729 F.2d 599, 601 (9th Cir.1984); *Rhodes v. Schweiker*, 660 F.2d 722, 723 (9th Cir.1981)). Clear and convincing reasons must also be given to reject a treating doctor's ultimate conclusions concerning disability, especially when they are not contradicted by another doctor. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Here, the ALJ's opinion contained the following information about his consideration of and reasons for assigning little weight to the opinion of Petitioner's treating physician, James Whiteside, M.D.:

> In August 2014, the claimant's treating physician, Dr. Whiteside, provided a Headache medical source statement. Dr. Whiteside noted that the extent of his treatment of the claimant at that time had consisted of only four visits over an eight-month period. He reported that the claimant experiences moderate to severe chronic headaches daily, but that her prognosis was good. Dr. Whiteside then went on to opine that during times that the claimant has a headaches, [*sic*] she would generally be precluded from performing even basic work activities, and need a break from the workplace; however, then stated that the number of likely absences from work per month was unknown. The undersigned gives little weight to this opinion, as it is not consistent with the record as a whole and Dr. Whiteside had only a short treatment

relationship with the claimant when this opinion was provided.

(AR 28 (citation omitted).)

Thus, the two reasons supplied by the ALJ for assigning little weight to the opinion of Petitioner's treating physician were: (1) the opinion was not consistent with the record as a whole, and (2) Dr. Whiteside saw Petitioner four times during an eight-month period.

Dr. Whiteside completed a headaches medical source statement on August 22, 2014. (AR 409-12.) Therein, Dr. Whiteside provided the following opinions. First, he opined that the intensity of Petitioner's headaches was typically moderate, but severe when she experienced migraines. *Id*. This opinion is not contradicted by another doctor. In his analysis of Petitioner's medical records, state agency reviewing physician Barry Cusack, M.D., opined that, in January 2013, Petitioner developed "global headaches that were chronic and moderate in severity." *Id*. at 79. Robert Vestal, M.D., the other state agency reviewing physician, reached the same conclusion. *Id*. at 92. Furthermore, the evidence as a whole does not contradict Dr. Whiteside's opinion about the intensity of Petitioner's headaches and migraines. For example, the objective medical evidence shows that, from the point in time Petitioner began seeing another treating physician, Anthony Jordan, M.D., in December 2013 through the date of the hearing in July 2016, she consistently reported chronic daily headaches with migraine headaches occurring several times each week. (*See* AR 268-74; 277; 291-92; 309; 329; 337; 375; 392; 400; and 433.)

Second, Dr. Whiteside stated that the headaches caused Petitioner nausea, visual

disturbance, and impaired sleep. *Id*. This opinion is not contradicted by another doctor.

Neither does the evidence as a whole contradict this opinion. For example, Petitioner was

prescribed and consistently took Ambien, and later, Lunesta, to help her sleep due to

headache pain symptoms associated with her pseudotumor cerebri. Additionally,

treatment notes from Dr. Whiteside and other providers record that Petitioner reported

experiencing visual disturbances and nausea. (*See* AR 337; 395.)

Third, Dr. Whiteside opined that Petitioner experienced chronic headaches seven

days a week. While this opinion is not directly contradicted by another doctor, both the

analyses of Dr. Cusack and Dr. Vestal state that Petitioner reported headaches two or

three days per week. (AR 79; AR 92.) Notably, the objective medical evidence as a whole

does not contradict Dr. Whiteside's opinion. The evidence shows that Petitioner

experienced migraine headaches two to three days a week, and that she experienced daily

(chronic) global headaches. (*See* AR 268-74; 277; 291-92; 309; 329; 337; 375; 392; 399;

400; and 433.)

Fourth, Dr. Whiteside stated that medication made Petitioner's headaches better.

*Id*. at 410. He reported that her response to Diamox treatment had been good. *Id*. at 411.

This opinion is not contradicted by another doctor. In his analysis, Dr. Cusack opined that

Diamox initially relieved Petitioner's headaches, but she reported it stopped being as

effective around May 1, 2014. (AR 79.) Dr. Vestal made the exact same observation. (AR

92.) The records show that Diamox had been generally effective in reducing the

frequency of migraines and the intensity of Petitioner's chronic headaches. However, the

records show also that Diamox caused significant side effects, including memory loss and confusion. (AR 25.) Petitioner was taken off Diamox and other medications were tried in its stead due to the side effects. However, because of its effectiveness, Petitioner was put back on Diamox, even though it was likely the culprit of her short-term memory disturbance. (*See* AR 291; 296; 300; 314; 387-88; 393; 400; and 433.)

Fifth, Dr. Whiteside reported that Petitioner's prognosis was "good." *Id*. at 411. This opinion is not directly contradicted by record evidence from another doctor, because neither Dr. Cusack, Dr. Vestal nor Dr. Anthony provided an opinion as to Petitioner's prognosis. However, the evidence as a whole *does contradict* this opinion because the record shows that even with consistent medication and attentive doctors continually adjusting and sometimes changing medication to alleviate side effects, Petitioner's headache pain, and other limitations and symptoms, persisted from 2013 through 2016. Notably, the record evidence suggests that some side effects caused by the Petitioner's medications –such as short-term memory disturbance– worsened. (*See* AR 338; 519.)

Sixth and finally, Dr. Whiteside opined that, during the times that Petitioner has migraines, she would not be able to work. *Id*. Relatedly, Dr. Whiteside opined that Petitioner's impairments would produce "good days" and "bad days" but that he did not know on average how many days per month Petitioner would likely be absent from work due to headache pain. *Id*. at 412. Thus, although Dr. Whiteside did not directly opine as to the ultimate effect of Petitioner's headache pain on her ability to work, he did conclude that, when Petitioner had migraines, she could not work. The evidence as a whole does

**MEMORANDUM DECISION AND ORDER - 11**

not contradict Dr. Whiteside's opinion. And, it is notable that the evidence shows Petitioner consistently reported experiencing two to three migraine headaches each week. (*See* AR 399.)

Finally, the Court finds the fact that Petitioner saw Dr. Whiteside four times over an eight-month period unpersuasive as a reason to assign Dr. Whiteside's opinion little weight. Although the treatment relationship was not as long as Petitioner's treatment relationship with Anthony Jordan, M.D., four visits over eight months shows significant engagement between a specialty physician, such as in this instance, a neurologist, and his patient.

Notably, Dr. Whiteside's opinions were never contradicted by another treating physician and were supported by the objective medical evidence as a whole. In sum, the Court finds the ALJ erred in assigning the opinions of Dr. Whiteside little weight, because the ALJ's reasons for rejecting them are unconvincing. Although the Court finds the ALJ so erred, the additional arguments raised by Petitioner will be addressed for the benefit of the Commissioner.

## 2.    Petitioner's Credibility

Petitioner alleges the ALJ's decision to discredit Petitioner's testimony about the intensity, persistence, and limiting effects of the symptoms of her medically determinable impairments was supported by vague reasoning and few concrete reasons, which, when viewed in context of the record as a whole, do not rise to the level of clear and convincing reasons. Specifically, Petitioner argues that the ALJ's statements demonstrate

**MEMORANDUM DECISION AND ORDER - 12**

a "fundamental lack of knowledge regarding Petitioner's major limitation – the effects of documented pseudo tumor cerebri, namely consistent headaches which would not be evident on neurologic or musculoskeletal exams." (Dkt. 13 at 14.)

To find Petitioner's testimony regarding the severity of her pain symptoms unreliable, the ALJ is required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ conducts a two-step analysis to assess subjective testimony where, under step one, the claimant "must produce objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of pain. *Id.* (quoting *Smolen*, 80 F.3d at 1281-82). If the claimant meets this threshold and there is no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id*.

The ALJ may consider the following factors in weighing a claimant's credibility: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Id*. If the ALJ's finding is supported by substantial evidence, the Court

**MEMORANDUM DECISION AND ORDER - 13**

"may not engage in second-guessing." *Id.* (quoting *Thomas*, 278 F.3d at 959).

In this matter, at step one of the two-step credibility process, the ALJ determined that Petitioner had shown underlying medically determinable impairments that could reasonably be expected to produce her symptoms—including headaches. However, at step two, the ALJ found Petitioner's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with evidence in the record. (AR 28.) During the July 7, 2016 hearing, Petitioner testified that pain from migraine headaches and pressure headaches prevents her from working. (AR 42.) She testified also that the side effects of her headache medication, namely dizziness, keep her from working. *Id*. Petitioner testified that she has migraine headaches four to seven days each week that can persist an entire four to seven day period, without letting up. (AR 42-43.) Petitioner testified also that she suffers from pressure in her head twenty-four hours and seven days a week. *Id*. at 43. Evidence in the record shows Petitioner's pressure headaches are consistent with her diagnosis of pseudotumor cerebri. (*See* AR 309.)

The ALJ did not point to any affirmative evidence of malingering at step two of the credibility analysis. Instead, in discrediting Petitioner's testimony, the ALJ considered Petitioner's prior statements about her symptoms and the extent of their limiting effects, namely prior statements by Petitioner regarding her daily activities along with the objective medical evidence. The Court will discuss each category of evidence as it relates to the ALJ's credibility finding.

i.     *Activities of Daily Living*

The ALJ found Petitioner's statements about the limiting effects of her symptoms on her activities of daily living to be less than credible. During the hearing, Petitioner testified that she experiences insomnia or can sleep for thirteen hours a day. (AR 51.) On days where she is awake, Petitioner testified that she usually wakes up at 11 a.m. *Id*. at 51-52. She stated that her children usually wake up at 10 a.m. and get themselves breakfast without her assistance.[1] *Id*. at 52. Petitioner testified that, even on a day when she does not have a migraine, she "doesn't really do much." *Id*. She testified that she watches the children to make sure they do their chores and take the family dogs outside. *Id*. Petitioner stated that she only showers when her husband is at home and usually stays in her pajamas. *Id*. at 52. Petitioner testified that she does not put dishes in the dishwasher, do laundry, mop, sweep, vacuum, or dust. *Id*. She stated that her children and husband care for the dogs and do all of the housework and yard work too. *Id*. at 53. According to her testimony, Petitioner does fix herself simple things to eat like cereal, a salad, or a pre-made freezer meal. *Id*. at 54. Petitioner also testified that she rarely leaves the house, and only drives if it is absolutely necessary because she worries about getting in an accident due to medication side effects. *Id*. at 55-56. Finally, Petitioner testified that she has given up most of her crafting hobbies, such as beading and jewelry work, because she has difficulty remembering instructions she just read. *Id*. at 56-57.

---

[1] The hearing took place in July and Petitioner's children were likely on summer break, hence the 10 a.m. wake up time.

**MEMORANDUM DECISION AND ORDER - 15**

In his decision, the ALJ found Petitioner's testimony that she "essentially does nothing all day" to be unsupported, because he did not find any evidence that she had reported that extent of these limitations in activities of daily living to her treating physicians. (AR 28.) The ALJ also found that Petitioner's testimony at the hearing stood in contrast to the daily living report Petitioner completed in 2013 in support of her application for benefits. *Id*. The ALJ noted that, in the 2013 report, Petitioner set forth "essentially normal activities of daily living, but now reports that her depression and symptoms have worsened so significantly in the last couple of years that she cannot do anything." *Id*. The ALJ found that "such a decline" was not "reflected in the objective medical evidence." *Id*. More specifically, the ALJ noted that Petitioner had presented for scheduled follow-up appointments but had not seen her doctors for visits related to medication side effects or increased symptoms throughout the time period between filing her initial adult function report and the hearing. *Id*.

In Petitioner's March 22, 2013 report of daily living, or adult function report, Petitioner stated that her main issue was intracranial hypertension, because it caused her extreme headaches, dizziness, and short term memory issues. (AR 190.) In this sense, Petitioner's 2013 report largely tracks the pain and symptoms she reported at the hearing before the ALJ in 2016. However, as noted by the ALJ, the report differs in some respects as to the degree to which the similar pain and symptoms impacted Petitioner's activities of daily living.

For example, inconsistent with her 2016 testimony, in 2013, Petitioner reported

that she cared for the three family dogs, made sure the dogs got outside to go to the bathroom, fed them, and cleaned up after them. (AR 191.) Also inconsistent to her testimony in 2016, in 2013 Petitioner stated she prepared simple meals for her family as well as for herself. *Id*. at 192. Similarly, in 2013 Petitioner reported that she did laundry, although she often needed reminders to get it done, and also put dishes in the dishwasher. *Id*. Finally, in contrast to her testimony in 2016, in 2013, Petitioner reported that she did go outside once each day to either get the mail or to watch the family dogs. *Id*. at 193.

However, consistent with her testimony in 2016, in 2013 Petitioner reported that her husband helped with the dogs on days when her symptoms were severe. *Id*. Also consistent with her testimony in 2016, in 2013 Petitioner reported that she had insomnia, and mostly supervised her children to be sure they had done their chores. *Id*. Further, in 2013, Petitioner reported being able to drive but preferring not to due to the side-effects of her medications. *Id.* at 194. Finally, in 2013, Petitioner similarly reported that she had difficulty crafting due to short term memory issues. *Id*.

During the hearing, the ALJ asked Petitioner why there was a difference in what she reported in 2013 and what she testified to regarding her activities of daily living. (Dkt. 60.) Petitioner testified that her symptoms had gotten a lot worse since 2013. *Id*. In particular, Petitioner testified that her pain had increased in duration and intensity and that her depression had worsened as well. *Id*. at 63. As set forth above, the ALJ found the objective medical evidence did not support Petitioner's statement that the reasons for the decline in her functioning were worsening pain and depression.

**MEMORANDUM DECISION AND ORDER - 17**

*ii.*     *Objective medical evidence*

As stated above, the ALJ found Petitioner's statements about the limiting effects of her symptoms on her activities of daily living to be less than credible in part because he found the objective medical evidence did not support Petitioner's statement that the reasons for the decline in her functioning were worsening pain and depression. In the ALJ's opinion, he specifically mentions that Petitioner's fundoscopic, neurological, and musculoskeletal exams all showed normal findings. (AR 28.) As stated above, Petitioner asserts that headaches (i.e. pain) would not be evident on neurologic or musculoskeletal exams. (Dkt. 13 at 14.) Petitioner argues also that objective medical evidence of normal eye exam results does not detract from her credibility, because she did not allege eye symptoms other than the photophobia that occurred during her migraine headaches. (Dkt. 13 at 14.) Petitioner also challenges the ALJ's characterization of the efficacy and effectiveness of her medications in managing her headaches and resultant chronic pain.

The record contains the following objective medical evidence regarding Petitioner's pain and depression between March 2013, when she submitted her first adult function report, and July 2016, when she testified at the hearing before ALJ Willis.

Office treatment records dated December 17, 2013, through April 8, 2014, from Intermountain Eye & Laser show consistent reports of head pain and pressure due to Petitioner's pseudotumor cerebri impairment. (AR 268-274.) The records note also that Petitioner reported "intermittent" stabbing pain, along with headaches and pressure. *Id.*

The record also contains progress notes dated June 6, 2013, through April 9, 2014,

from St. Luke's Family Health recorded by another treating physician, Anthony Jordan, M.D. (AR 277-388.) The records show that when Dr. Jordan began seeing Petitioner in 2013, she had already been diagnosed with pseudotumor cerebri. *Id.* at 387-88. At that time, she took Prozac, Vicodin, Diamox, levothyroxine, and Ambien. *Id.* She also had numbness and tingling in her fingers and heels. *Id.* at 387. On April 3, 2013, Petitioner was seen for a hearing evaluation after complaining of sinus pressure and trouble hearing. *Id.* at 385. Although Petitioner reported aural pain and pressure, treatment notes indicate the results of the evaluation were normal and did not explain her complaints. *Id.*

Another record from April 2013 reported that the results of an MRI of Petitioner's brain were normal. *Id.* at 378. The MRI was performed due to Petitioner's complaints of headaches, vision changes, and her history of pseudotumor cerebri. *Id.* at 377. The records show also that a lumbar puncture was performed on Petitioner in April 2013 to relieve pressure in her head. *Id.* at 375.

On March 11, 2013, treatment notes reflect that Petitioner reported to Dr. Jordan that, although she had been doing well previously, her stress, insomnia, and depression had recently increased significantly. (AR 337.) On March 27, 2013, Petitioner was again seen by Dr. Jordan. At that visit, her chief complaint was migraine headaches. *Id.* at 338. At that time, Petitioner reported she had been experiencing migraines for approximately two and a half weeks. *Id.* Petitioner reported her migraine symptoms had appeared after initiating citalopram for her mood disorder. *Id.* At that time, Petitioner reported she was experiencing occasional mental fogginess and confusion. *Id.* The following month, on

April 2, 2013, Petitioner was seen by Dr. Jordan for another appointment. *Id*. at 329. Again, Petitioner's chief complaint was migraine headaches. *Id*. She reported that although her medications, Phenergan and Norco, helped with the pain, symptoms would return the next day. *Id*. The citalopram was changed to Prozac and Petitioner was instructed to monitor her headaches and follow up with Dr. Jordan in three months, or, in two weeks if the migraines did not improve. *Id*. at 330.

Petitioner was seen approximately two weeks later for a follow up appointment on April 16, 2013. At that time, Petitioner reported four weeks of daily headache. (AR 326.) Just days later, on April 22, 2013, Petitioner again visited Dr. Jordan for a follow up appointment. *Id*. at 320-21. As noted above, the previous week she had been treated with a post lumbar puncture for headaches. *Id*. At that time, Petitioner was prescribed Phenergan for nausea, and her oxycodone prescription was refilled for acute pain control. *Id.* At the next recorded visit, April 25, 2013, Petitioner reported improvement in her spinal headache. *Id*. 318. Dr. Jordan noted that once her spinal headache resolved, he anticipated she would return to "her baseline pseudotumor cerebri headache" and at that point, they would consider initiation of Diamox to treat the symptoms. *Id*.

These treatment notes and medical evidence show that, prior to March 22, 2013 and immediately after, Petitioner was experiencing daily chronic headaches, occasional mental fogginess, and depression. Significantly, on March 11, 2013, prior to completing the adult function report, treatment records reflect that Petitioner reported her stress, insomnia, and depression had recently increased significantly. As stated previously, one

of the primary reasons the ALJ found Petitioner less than credible was a lack of evidence in the medical record of worsening of her pain symptoms or depression to support the changes in her testimony as to her ability to perform routine daily activities. However, the Court's review of the objective medical evidence for records of worsening pain symptoms and depression reveals the following applicable evidence.

Petitioner was seen again on May 7, 2013. At that visit, Dr. Jordan prescribed Diamox at a low dose, to be increased as tolerated for her pseudotumor cerebri headache. (AR 314.) At the next visit, May 23, 2013, Petitioner reported tolerating the Diamox but that it had not improved her chronic headaches. *Id*. at 309. She reported also that the Prozac was working well for her mood symptoms. *Id*. A few months later, on June 5, 2013, Petitioner reported that her headache had been improving on an increased dose of Diamox. *Id*. at 300. She reported also that her depression symptoms had increased, secondary to increased health issues—she was put on a higher does of Prozac. *Id*. at 302.

At her next visit, in August 2013, Petitioner reported her headaches had been improving on Diamox, but because she had experienced stress on a camping trip, the severity of her headache had increased once again. *Id*. at 296. She reported the Prozac was controlling her mood symptoms. *Id*. The following visit, Sept. 10, 2013, saw no improvement to her headaches and brought a recommended increase of the Diamox dose. *Id*. at 291. At a visit on October 4, 2013, Petitioner noted some tingling in extremities due to the Diamox dose, but that otherwise she was stable. *Id*. at 286.

Notes taken months later by Dr. Jordan on March 21, 2014, show Petitioner had

recently been treated for ear symptoms, which had improved with antibiotics but did not fully resolve. (AR 282.) Notes from April 9, 2014, state that Petitioner reported increased headache frequency and worsening mood symptoms. *Id.* at 277. Petitioner reported also fullness and discomfort in her ears. *Id.* Notably, moving forward in time to March 25, 2016, treatment notes of Dr. Jordan show Petitioner had seen improvement of her depression after being started on a new medication—Cymbalta. *Id.* at 433. The notes state also that she was recently "restarted" on Diamox for her history of chronic daily headache. *Id.* The notes state she was still struggling with insomnia at that time because the Ambien was no longer effective. She was prescribed Lunesta for that reason. *Id.*

Meanwhile, Petitioner first saw neurologist James Whiteside, M.D., in December 2013. Dr. Whiteside's consultation note summarized Petitioner's relevant treatment history and status at that point. In it, Dr. Whiteside recorded that Petitioner had occasional migraines for the previous eight years that were usually responsive to Norco. (AR at 400.) However, in February 2013, the headaches became more frequent. *Id.* Dr. Whiteside noted also that the MRI of her brain showed normal findings. The note states that, in April 2013, she was started on Diamox (by Dr. Jordan), a medication that she had tolerated and reduced the severity of her headaches. *Id.* Dr. Whiteside noted also that findings of an eye exam in June 2013 showed Petitioner's optic nerves were normal. *Id.* Finally, the consult note recorded that Petitioner had anxiety and depression but felt each was situational due to chronic pain. *Id.* at 401. Dr. Whiteside recorded that Petitioner reported Prozac had helped her with her mood and at the time she did not wish to

increase the dose. *Id*.

Petitioner's second appointment with Dr. Whiteside was in February 2014. (AR 395.) At that time, she reported her headaches were not as severe. *Id*. In May 2014, Petitioner presented for another visit to Dr. Whiteside, reporting two weeks of consistent headaches. *Id*. at 392. Treatment notes indicated metabolic acidosis may have been contributing to her headaches—caused by high dose of Diamox—which was decreased at that time. *Id*. at 393. A note from August 18, 2015 states Petitioner presented with increasing depression. *Id*. at 455. A final treatment note of March 2, 2016, states that Petitioner returned for follow up to chronic headaches and pseudotumor cerebri. The physician's note reports that Petitioner's complaints of memory loss were likely a consequence of medications such as amitriptyline, Diamox, and gabapentin. *Id*. at 516. The note remarks that Petitioner had been referred to a physician for Botox injections to treat her migraines, because it does not cause memory loss or other systemic side effects. *Id*. Those injections were administered on May 19, 2016. *Id*. at 533.

As indicated above, treatment notes and medical evidence show that, prior to March 2013 (when Petitioner completed her adult function report) and immediately after, Petitioner was experiencing daily chronic headaches, occasional mental fogginess, and depression. As set forth immediately above, treatment notes from the same doctor, Dr. Jordan, show that in March 2016 and prior, Petitioner was experiencing daily chronic headaches and struggled with depression. Perhaps the change most notable is that Petitioner's complaints of memory loss in 2016 were more extreme than the occasional

memory fog she reported in 2013. However, in sum, the objective medical evidence does not show a significant change in the symptoms of pain or in depression that Petitioner was experiencing in 2013 versus what she was experiencing in 2016. Instead, the evidence shows Petitioner and her physicians worked to treat the same headache pain and depression, with varying degrees of success throughout the approximately three year period. For this reason, the Court finds the ALJ's reason for discrediting Petitioner's 2016 hearing testimony regarding daily activities was based on substantial evidence. Thus, the Court does not find the ALJ committed error in this respect.

### 3. Lay witness testimony

Petitioner argues the ALJ erred in his consideration of the lay witness testimony given by Petitioner's husband. Specifically, Petitioner asserts the ALJ failed to give reasons germane to the witness in rejecting his testimony. An ALJ must consider evidence from sources other than the claimant, including family members and friends, to show the severity of a claimant's impairment. 20 C.F.R. § 404.1513(d)(4); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). Lay testimony regarding a claimant's symptoms constitutes competent evidence that an ALJ must consider, unless he or she expressly determines to disregard such testimony and gives reasons germane to the witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (internal citations omitted)); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294 (9th Cir. 1999). Such reasons include conflicting medical evidence, prior inconsistent statements, or a claimant's daily

activities. *Lewis v. Apfel*, 236 F.3d 503, 511–12 (9th Cir. 2001).

In rejecting lay testimony, "the ALJ need not cite the specific record as long as 'arguably germane reasons' for dismissing the testimony are noted, even though the ALJ does 'not clearly link his determination to those reasons,' and substantial evidence supports the ALJ's decision." *Holzberg v. Astrue*, No. C09-5029BHS, 2010 WL 128391 at *11 (W.D. Wash. Jan. 11, 2010) (citing *Lewis*, 236 F.3d at 512). However, "where the ALJ's error lies in failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F3d 1050, 1056 (9th Cir. 2006).

In this case, Petitioner's husband, Robert Lewis, provided a written statement in support of his wife's application for disability benefits. (AR 261.) The statement describes how he and his children used to rely on the income his wife earned at her full time job delivering newspapers. It describes how her headaches returned in December 2012, and how he tried to assist her in her job by driving the delivery car and lifting the newspaper bundles—yet that her headaches got so bad that she had to quit in mid-January 2013. *Id.* The statement describes the diagnosis of Petitioner's intercranial hypertension in the spring of 2013, and the general worsening of her headache pain symptoms and depression, despite treatment. *Id*. Mr. Lewis's statement describes the effect the worsening symptoms had on Petitioner's activities of daily living and is largely consistent

with the statements Petitioner made during the 2016 hearing before the ALJ—e.g. that she can no longer perform even limited housework and chores. *Id.*

The ALJ's discussion of the lay witness testimony of Petitioner's husband describes it as containing "exacting observations as to date, frequencies, types, and degrees of medical signs and symptoms, as well as to the intensity of [Petitioner's] unusual moods or mannerisms." (AR 26.) The ALJ noted that there was no indication in the record that Petitioner's husband was medically trained, and thus found the "exacting observations" unpersuasive. *Id.* Ultimately, the ALJ assigned the lay witness testimony little weight because it was "not wholly credible or persuasive in light of the lack of consistent objective medical findings."

The Court does not fully agree that Mr. Lewis's statement made exacting observations as to medical signs and symptoms that only a medically trained person could make. However, under the standard of review stated above, and considering the Court found no error as to the ALJ's credibility finding regarding lack of evidence of Petitioner's alleged worsening symptoms, pain, or depression, the Court finds that because the ALJ considered Petitioner's husband's testimony in light of the same objective medical findings, the ALJ did provide a germane reason for assigning the lay testimony of Petitioner's husband little weight. For this reason, the Court finds the ALJ did not err in assigning little weight to the lay witness testimony of Petitioner's husband.

**4.      Residual Functional Capacity**

At the fourth step in the sequential process, the ALJ determines whether the

impairment prevents the claimant from performing work which the claimant performed in the past, i.e., whether the claimant has sufficient residual functional capacity to tolerate the demands of any past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). A claimant's residual functional capacity is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a). An ALJ considers all relevant evidence in the record when making this determination. *Id.* Generally, an ALJ may rely on vocational expert testimony. 20 C.F.R. § 404.1566(e); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). An ALJ must include all limitations supported by substantial evidence in his hypothetical question to the vocational expert but may exclude unsupported limitations. *Bayliss*, 427 F.3d at 1217. The ALJ need not consider or include alleged impairments that have no support in the record. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1163–64 (9th Cir. 2000). Also, at step four, the ALJ found Petitioner was not able to perform her past relevant work as a newspaper delivery person, sandwich maker, cashier, or fast food worker.

Thus, the burden shifted to the ALJ at step five to demonstrate that Petitioner retaines the capacity to make an adjustment to other work that exists in significant levels in the national economy. In making this demonstration, the ALJ considered Petitioner's residual functional capacity, age, education and work experience. In so doing, the ALJ found Petitioner could perform sedentary jobs, including that of a document scanner, accounts clerk, or manual food processor.

As set forth above, the Court finds the ALJ erred by failing to assign substantial

weight to the opinion of Petitioner's treating provider that, when Petitioner experiences migraine headaches, she can not work. The vocational expert in this case testified that, if a person misses two or may days of work in a month, on a regular basis, that would be beyond what an employer would tolerate. (AR 71.) For this reason, Petitioner's residual functioning capacity must be reconsidered by including properly weighed opinion evidence supplied by Dr. Whiteside about the severity, frequency, and limiting effects of Petitioner's migraine headaches.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2)      This action is be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3)      This Remand is considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

DATED: February 26, 2019

*[signature]*

Candy W. Dale
U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 28**